UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| FPM FINANCIAL SERVICES, LLC<br><br>Plaintiff,<br><br>v.<br><br>REDLINE PRODUCTS, LTD; BLOW BEFORE YOU GO INTERNATIONAL<br><br>Defendants. | Civil Action No.: 3:10-cv-06118 |

**FPM FINANCIAL SERVICES, LLC'S BRIEF IN OPPOSITION
TO DEFENDANT REDLINE PRODUCTS, LTD'S
MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

Response to Statement of Material Facts Allegedly Not in Dispute ......................................1

FPM's Counter Statement of Facts ...............................................................................................4

Argument ..........................................................................................................................................8

    1.    Because of the conflicting choice-of-law provisions in the Agreement, New Jersey law applies to this dispute. .......................................................................8

        A.    The agreement states that both South African Law and the CISG as the applicable law to resolve disputes under this Agreement. ............................8

        B.    Under New Jersey's choice-of-law provisions, New Jersey law should govern this dispute. .......................................................................................8

    2.    The Agreement's language establishes that FPM was the "sole exclusive USA distributor," and Redline cannot introduce extrinsic evidence to contradict this unambiguous language. ............................................................................10

        A.    The parol-evidence rule excludes the extrinsic evidence that Redline seeks to submit on this motion. .........................................................................10

        B.    Distribution agreements require exclusivity. ..............................................11

        C.    The listing of specific accounts in the Agreement in no way limits FPM's exclusivity. ...............................................................................................13

    3.    FPM's damages are established by the price at which Redline sold the exclusive rights that FPM itself possessed. ..............................................................14

    4.    Redline breached the covenant of good faith and fair dealing by giving exclusive rights to BBYG, precluding FPM from expanding its account base under the agreement. ..........................................................................................14

    5.    It is undisputed that Redline breached the confidentiality agreement. ....................16

Conclusion ...................................................................................................................................17

**Response to Statement of Material Facts**
**Allegedly Not in Dispute**

1. Denied as to "nonexclusive." (See language in agreement at Exhibit A to the Certification of Anthony Ambrosio at Articles 1.1, 1.3 and 7.1,) admit as to remaining allegations.

2. Denied as to the statement that the Winner Agreement was in "contrast" to the FPM Agreement, since FPM also had the exclusive rights under its agreement with Redline. (*See* Exhibit A to the Certification of Anthony Ambrosio at Articles 1.1, 1.3, and 7.1.)

3. Admit.

4. Denied. First, this paragraph contains no citation to the record to support the claim that "FPM was advised that Redline was no longer giving exclusivity for the entire U.S. market because of this negative prior experience." Further, any citation to conversations that Redline uses in support of its contention that FPM was alerted to its understanding that the agreement was nonexclusive does not consist of conversations that were with Mengrone. Finally, the statement that Redline uses to support the contention that FPM "accepted this fact and did not expect exclusivity" was from email communication between the owner of Redline and its agent. Redline cannot point to a single conversation in which it expressly stated to Mengrone that this was not an exclusive contract.

5. Admit, but with the emphasis that nothing cited to by Redline in this paragraph suggests that the trial year did not also include exclusivity for the entire U.S. market. Denied as to any implication in this paragraph that the agreement between FPM and Redline was not exclusive.

6. Denied that these accounts served as any "limitation." The agreement clearly states that accounts could be added. (*See* Exhibit A at Article 3.3.) Redline had also approved sale

of its product to Staples, as shown by the fact that it produced packaging of its product with the Staples logo.

7. Admit.

8. Admit.

9. Admit.

10. Admit.

11. Admit. But the agreement has a conflicting choice-of-law provision, which comes at the very next paragraph at which Redline ended its citation in its Statement of Material Facts. (*See* Article 13.1(c).)

12. Admit as to the factual allegations in this paragraph. Denied as to the implications that Redline seeks to draw from these facts.

13. Denied: "The FPM/Redline deal was exclusive, just like every other distribution agreement that Redline entered into. (*See* Sevim Deposition Testimony, attached to the Certification of Anthony Ambrosio as Exhibit F at 41:10-16.)

14. Admit that FPM terminated the agreement following Redline's breach, denied as to the vague and ambiguous claim that FPM entered into an agreement with Contralco "shortly thereafter."

15. Admit to the extent that this paragraph accurately describes the Contralco agreement. Denied that any such exclusivity is in "contrast."

16. Admit. The agreement with Contralco was entered into after Redline's breach.

17. Admit.

18. Admit.

19. Admit, but the agreement with Contralco was entered into only after Redline breached the agreement with FPM.

20. Admit as to the terms of the agreement. But denied as to the allegation that Redline never disclosed the identity of FPM's sales groups, as the Agreement with Blow Before You go explicitly states that these groups were disclosed. (*See* Article 1.1(j) of the Redline/BBYG Agreement, attached to the Certification of Craig Atkinson, which is attached to the Certification of Anthony Ambrosio at Exhibit C.)

21. Admit. FPM's failure to make sales under the agreement was caused by Redline's breach. (*See* Certification of Ron Liffman, attached to the Certification of Anthony Ambrosio at Exhibit H.)

22. Admit.

23. Admit.

24. Admit.

25. Admit. The damages FPM has incurred do not require the submission of expert testimony.

**FPM's Counter Statement of Facts**

FPM Financial Services, LLC entered into an exclusive distribution agreement with Redline Products, LTD. to distribute breathalyzers in the United States. The clear and express language in the agreement establishes that FPM was the sole and exclusive distributor for Redline's breathalyzers in the United States: "[Redline] hereby confers upon [FPM] … the sole selling-rights for its products defined in article "1.2 … in the territory defined in article 1.3." (*See* Exhibit A to the Certification of Anthony Ambrosio at Article 1.1:) "The Territory covered by this agreement refers to the United States of America;" (*Id.* at Article 1.3.)  The Agreement also explicitly identifies FPM as the "Sole Exclusive USA Representative: "[Redline] will have the right to release [FPM] as Sole Exclusive USA Representative." (*Id.* at Article 7.1.)

As succinctly put by Nicky Sevim, Redline's agent who negotiated the deal with Mengrone,"[t]his is an exclusive contract. Frank has an exclusive contract." (*See* Sevim deposition testimony, attached to the Certification of Anthony Ambrosio at Exhibit G at 30:5–6.) The FPM/Redline deal was exclusive, just like every other distribution agreement that Redline entered into. (*Id.* at Exhibit F at 41:10-16.) From the very start of the discussions with Sevim, Mengrone made it clear that he needed and expected exclusivity under this deal. (*See* October 8, 2009 email from Mengrone to Sevim (*See* Exhibit D to the Certification of Anthony Ambrosio (explaining that Mengrone would need confirmation that he had the exclusive rights to sell the breathalyzers in the U.S. and explaining the language needed for the exclusivity documentation.)) Redline has not produced any correspondence between Mengrone and Sevim, or between Mengrone and the owners of Redline, in which they disabused Mengrone of the notion that he would be receiving exclusivity under this Agreement.

4

But, Redline has sought to introduce numerous email conversations between Sevim and its owners, which allegedly reveal that Redline never intended on entering into an exclusive agreement with FPM. These extrinsic statements directly contradict the express terms in the contract. These conversations cannot be introduced to contradict the express and clear terms of the Agreement, particularly where there is neither an assertion nor the implication that Mengrone was aware of the substance of these conversations.

Redline cannot introduce these statements to contradict the clear intent—as shown by the contract's express language—that this was an exclusive contract. "… it is a contract [that] gives the guarantee of exclusivity of the market in the United States … the idea was to let Frank Mengrone prove himself …" (*See* Exhibit F at 35:15-19.) "It's understood that if the wording means distribution in America … that means it's exclusive." (*See* Exhibit G at 29:21–23.)

The listing of accounts that Redline points to in the agreement says nothing about limiting exclusivity under the agreement, and Mengrone has explained that these were listed solely for credit purposes: "…as Redline was doing the invoicing, they needed a list of the initial accounts we were going to go to so they could approve the credit, so that's why they were put in." (*See* Exhibit E at 40:15–18.) Redline also fails to account for the fact that these sales groups each had hundreds of accounts within them:"…each of the sales groups all have 100 accounts each after that plus we were going to add more people on as we went down. It was for the expediency of the agreement … that was why I gave them an initial set of names to go to." (*See id.* at 40:18–25.) Redline cannot point to one word in the agreement that suggests that these accounts were listed so that FPM's exclusivity would be limited in any manner.

As Sevim and Mengrone testified to in deposition, distribution agreements require exclusivity: "You cannot … if you're selling a commodity, you cannot sell a commodity in the

United States unless you're in control of the product. Otherwise, you would be – the people would sue you for saying, you –you're selling me a product, and my competitor is selling a product for less – at half the price…" (*See* Exhibit F at 66:23 – 67:4;)"we either have the entire market or we have nothing. We don't work for some customers. We don't do that. It doesn't make any sense. If you speak to anyone in the agency business, nobody does this." (*See* Exhibit G at 23:8–12.)

      Without exclusivity, the distributor cannot guarantee a price to an account, and thus, cannot guarantee to that account that their competitor will not be able to get the same product at a lower price from someone else and undercut them: "… if you go into certain accounts like a Staples, you want to give them maybe an exclusive … and I'm not going to sell Office Depot … you want to give them an exclusive and give them a reason to get on board with you right away because that's their area of expertise. So now I couldn't do that … if you have a different distributor, they may be undercutting my prices." (*See* Exhibit E at 76:16–77:5.)

      Further, Redline's actions in giving another distributor the exclusive rights eliminated any chance for Mengrone to sell Redline's breathalyzers: "… they actually created a scenario where I'm competing against myself in the same market by putting another distributor that has the right to sell whatever prices … so everybody is going to come to me, 'well, how come his is cheaper?'" (*See id.* at 77:8–13.) A potential deal with Staples and for an infomercial was lost as a direct result of Redline's breach of the agreement and granting of the exclusive U.S. Rights to Blow Before You Go: "Once I was informed … that Redline was not planning on fulfilling its promise … of providing [FPM] with exclusive distribution rights and price controls in the United States, I cancelled the appointment with Staples and refused to commit to developing an infomercial to sell breathalyzers." (*See* Liffman Certification, attached to the Certification of

6

Anthony Ambrosio at Exhibit H, ¶ 5.) These plans had to be cancelled solely because FPM could no longer guarantee pricing or exclusivity, as a direct result of Redline's breach. (*See id.* at ¶ 6.)

It was clear that Mengrone's intent in entering this agreement was to grow well beyond those initial accounts: "the whole intention was that we had the whole United States and we would roll out account by account and then start to grass roots it out with the sales groups that were in the market." (*See* Exhibit E at 42:19–22.) Thus, even if this was a nonexclusive agreement, Redline breached the duty of good faith and fair dealing when it gave exclusive rights to BBYG, thereby depriving FPM of the fruits of the contract in being able to grow and expand his account base.

**Argument**

1.  **Because of the conflicting choice-of-law provisions in the Agreement, New Jersey law applies to this dispute.**

A.  **The agreement states that both South African Law and the CISG are the applicable law to resolve disputes under this Agreement.**

Choice-of-law provisions are material terms to an agreement. *CECG, Inc. v. Magic Software Enters.*, 51 Fed. Appx. 359, 2002 WL 31248483 (3d Cir. 2002). Thus, when there is a conflict in an agreement over the choice of law, there will be found to be no meeting of the minds as to the choice of law, and the contract should be read as if these choice-of-law provisions did not become a part of FPM and Redline's agreement. *Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F. Supp. 345, 352 (M.D.N.C. 1995). Here, the agreement states that both South African law and the CISG apply to any disputes between Redline and FPM. (*See* Exhibit A at Article 13(1)(a) and (1)(c).) These are in direct conflict, as South Africa is not even a signatory to the CISG. Accordingly, there was never a meeting of the minds over the applicable law to govern disputes under this contract, and both of these provisions should be disregarded.

B.  **Under New Jersey's choice-of-law provisions, New Jersey law should govern this dispute.**

In Federal court, the determination of which state's laws will apply to a dispute is governed by the laws of the forum state. *See* Restatement, Conflict of Laws 2d, § 7(2); *see also Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487 (1941) (holding that federal courts must apply the conflict of laws rules prevailing in the states in which they sit.); *see also McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657 (3d Cir. 1980).

New Jersey has a two-step choice of law analysis. First, the court determines whether there is any conflict between the law of the interested states. At the second step, if the court has

determined that a conflict exists, it proceeds by conducting an analysis of the competing policies of the states. The court will evaluate the respective interests of the involved states to determine which state has the most significant interest in governing with respect to the claim. *Erny v. Estate of Merola,* 171 N.J. 86, 792 A.2d 1208 (2002).

      Here, Redline has not shown that there is a conflict in the law between New Jersey and South Africa. Both are based in the common law, and nothing that appears in Redline's report on South African law appears to be in conflict with basic contract principles applicable in New Jersey.

      Further, New Jersey has the more significant interest to this claim. The rights at issue here are the exclusive rights to distribute a product within the United States. New Jersey courts have a more significant interest in determining how goods will be distributed within this market than does South Africa. Thus, this court should apply New Jersey law to the dispute.

**2. The Agreement's language establishes that FPM was the "sole exclusive USA distributor," and Redline cannot introduce extrinsic evidence to contradict this unambiguous language.**

**A. The parol-evidence rule excludes the extrinsic evidence that Redline seeks to submit on this motion.**

The clear language of FPM and Redline's agreement establishes that FPM received the exclusive rights to distribute Redline's breathalyzers in the United States. The agreement explicitly states as such: "[Redline] hereby confers upon [FPM] … the sole selling-rights for its products defined in article "1.2 … in the territory defined in article 1.3." (Article 1.1:) "The Territory covered by this agreement refers to the United States of America;" (Article 1.3.) The Agreement also explicitly identifies FPM as the "Sole Exclusive USA Representative: "[Redline] will have the right to release [FPM] as Sole Exclusive USA Representative." (Article 7.1.) In its motion for summary judgment, Redline has improperly sought to introduce extrinsic evidence that contradicts these clear and unambiguous terms.

Redline's own agent, Nicky Sevim, confirms that this was an exclusive agreement: "… it is a contract [that] gives the guarantee of exclusivity of the market in the United States … the idea was to let Frank Mengrone prove himself …" (*See* Exhibit F at 35:15-19.)

While extrinsic evidence may supplement an agreement's terms, it cannot be used to contradict an integrated agreement's explicit terms. Courts will generally not depart from the plain meaning of a contract. *East Brunswick Sewerage Authority v. East Mill Associates, Inc.*, 365 N.J. Super. 120, 125 (App. Div. 2004.) And where there is an "integrated contract," as asserted by Redline, the parol-evidence rule acts to exclude evidence that seeks to contradict the contract's terms. *Atlantic Northern Airlines, Inc. v. Schwemmer,* 12 N.J. 293, 302 (1953). The rule bars consideration of other expressions of intent that are outside the contract. *Wilkins v. Bailey Engineering Co.*, 21 N.J. Super. 227, 230 (1952).

Redline's brief is filled almost exclusively with evidence of outside discussions between Redline's owners and its agents, which it attempts to use to alter the agreement's express language. There is no evidence that the understanding in these discussions was conveyed to Mengrone, and these discussions cannot be used to alter the express language in the agreement specifying that FPM is Redline's sole exclusive USA distributor.

**B.      Distribution agreements require exclusivity.**

Mengrone has decades of experience in distributing products. (*See* Exhibit E at pp. 15–17.) Like with every other distribution agreement has entered into, he was under the belief that this agreement gave him the exclusive rights in the United States: "the whole intention was that we had the whole United States and we would roll out account by account and then start to grass roots it out with the sales groups that were in the market." (*Id.* at 42:19–22.)

At his deposition, he explained precisely why such agreements require exclusivity: "… if you go into certain accounts like a Staples, you want to give them maybe an exclusive … and I'm not going to sell Office Depot … you want to give them an exclusive and give them a reason to get on board with you right away because that's their area of expertise. So now I couldn't do that … if you have a different distributor, they may be undercutting my prices." (*Id.* at 76:16–77:5.) Redline's breach made these sales impossible: "… they actually created a scenario where I'm competing against myself in the same market by putting another distributor that has the right to sell whatever prices … so everybody is going to come to me me, 'well, how come his is cheaper?'" (*Id.* at 77:8–13.)

Redline's own agent, Nicky Sevim, confirms this: "You cannot … if you're selling a commodity, you cannot sell a commodity in the United States unless you're in control of the product. Otherwise, you would be – the people would sue you for saying, you –you're selling me

11

a product, and my competitor is selling a product for less – at half the price…" (*See* Exhibit F at 66:23–67:4;) "we either have the entire market or we have nothing. We don't work for some customers. We don't do that. It doesn't make any sense. If you speak to anyone in the agency business, nobody does this." (*See* Exhibit G at 23:8–12.) Redline also gave FPM the sole right to set the pricing for the USA in the agreement. (*See* Exhibit A, Article 5.) Such powers can only be given to an exclusive distributor within a territory: if another distributor entered the U.S. market with the same rights it would negate FPM's right to set the price.

      Retailers will not deal with a distributor who cannot guarantee that their competitors will not receive the same product at a lower price. Without exclusivity, FPM had no prospects of making any sales of Redline's breathalyzers. It would have made no sense for FPM to enter into this agreement without exclusivity. Redline, as a member of this industry, either knew or should have known this fact.

      This claim is also confirmed by those who FPM was attempting to do business with. Before Redline's breach, FPM was set to meet with representatives from Staples in hopes of distributing the breathalyzer through the chain. (*See* Exhibit H.) This could have been a very lucrative engagement given Staples's prominence. As explained by Liffman, this meeting was cancelled once he learned that FPM did not have the sole and exclusive rights to the USA. Liffman confirmed that the deal with Staples could not go through absent exclusivity and a guaranteed uniform price in the market. (*Id.* at ¶ 6.)

**C.      The listing of specific accounts in the Agreement in no way limits FPM's exclusivity.**

Redline cannot point to one specific word or statement in the Agreement that even implies that the list of accounts was meant to limit the explicit grant of exclusivity to FPM. The agreement only states that as of the time of contracting, Redline had "approved" certain accounts. Mengrone has explained that these accounts were listed for expediency and credit purposes: "…as Redline was doing the invoicing, they needed a list of the initial accounts we were going to go to so they could approve the credit, so that's why they were put in." (Exhibit E at 40:15–18.)

Redline's argument here also makes little sense, since each of the sales groups listed in the account had  hundred accounts that they themselves sold to: "…each of the sales groups all have 100 accounts each after that plus we were going to add more people on as we went down. It was for the expediency of the agreement … that was why I gave them an initial set of names to go to." (Exhibit E at 40:18–25.) If Redline had meant to limit FPM's exclusivity under the Agreement, it would have had to know who these accounts were so that they could ensure that any other agreements they entered into would not breach this agreement. Also, under the agreement Redline had an obligation to keep FPM informed of any relevant communications with customers in the territory. (Article 4.2.) Why would Redline have to notify FPM of such communications if FPM didn't have the exclusive right to deal with these customers?

3.  **FPM's damages are established by the price at which Redline sold the exclusive rights that FPM itself possessed.**

Redline sold the exclusive USA rights that FPM possessed to BBYG for $1 million. *See* Article 2.3 of the Agreement between Blow Before You go and Redline, attached to the Certification of Craig Atkinson, which is included as Exhibit C to the Certification of Anthony Ambrosio.) Accordingly, Redline itself has established the value of the rights that it wrongfully deprived FPM of, and the extent of the damages that FPM has incurred as a result of FPM's breach.

Also, Mengrone has put in substantial time and effort into promoting Redline and setting up the product for distribution: "… I put in six months of my time and effort and contacts and everything to work with this to develop a business for them …" (Exhibit E at 64:7–9.) He is entitled to recover for the time and expenses that were rendered useless by Redline's breach.

4.  **Redline breached the covenant of good faith and fair dealing by giving exclusive rights to BBYG, precluding FPM from expanding its account base under the agreement.**

Adopting Redline's argument that this was a nonexclusive agreement does not relieve it from liability. Assuming for argument's sake that this was a nonexclusive agreement, Redline's act of giving Blow Before You Go exclusive USA rights while FPM's deal was still in place denied FPM of the chance to grow its customer base under the agreement. This denial to FPM of the fruits of the agreement constitutes a breach of the covenant of good faith and fair dealing by Redline.

Both the common law and the U.C.C. impose a duty of good faith and fair dealing in the performance of all contracts. *See Bak-A-Lum v. Alcoa Building Products, Inc.,* 69 N.J. 123, 129-30 (1976); Restatement (Second) of Contracts § 205 (1981); *see also* N.J.S.A. 12A:2-103. The

14

covenant of good faith implies that neither party will take action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *Palisades Properties. Inc. v. Brunetti*, 44 N.J. 117, 130 (1965). Here, even if this was a nonexclusive contract between FPM and Redline, FPM still had the ability to add accounts as time went on. And it was always Mengrone's intent and understanding that the accounts would grow beyond those listed in the agreement: "the whole intention was that we had the whole United States and we would roll out account by account and then start to grass roots it out with the sales groups that were in the market." (Exhibit E at 42:19–22.) When Redline gave exclusive rights to sell its breathalyzers in the United States to BBYG, this deprived FPM of the chance to expand under the contract, and thus, denied it of the fruits it expected to receive.

Accordingly, Redline breached the implied covenant of good faith and fair dealing in giving exclusive rights to the United States to BBYG when it already had the obligation to permit the expansion of FPM's accounts in the U.S.

## 5.     It is undisputed that Redline breached the confidentiality agreement.

FPM and Redline executed a separate Confidentiality and Nondisclosure Agreement in conjunction with their distribution agreement. (*See* Exhibit B.) Under the agreement, confidential information was defined as, in part, sales-groups. (*Id.* at ¶ 1.) Such confidential information could only be used in connection with the business relationship with FPM. (*Id.* at ¶ 2.) Redline admits that it told Blow Before You Go the identity of BBYG's sales groups. Right in the BBYG agreement it states that Redline disclosed to BBYG the identify of FPM's confidential sales groups: "… excluding those disclosed customers in the United States of America, allocated to FPM Financial Services, LLC in terms of a prior agreement entered into by supplier." (*See* Article 1.1(i) of the Agreement between Blow Before You Go and Redline, attached to the

15

Certification of Craig Atkinson, which is attached to the Certification of Anthony Ambrosio at Exhibit C.)

**6.     The covenant not to compete is inapplicable based on Redline's prior breach.**

As argued above, even if Redline is correct in arguing that this agreement was nonexclusive, it still breached first by giving exclusive rights to BBYG. This deprived FPM of the ability to expand its customer base under the agreement, and constitutes a breach of the covenant of good faith and fair dealing. Thus, since the agreement was already breached, Mengrone's attempts to mitigate his damages through entering into a deal with another company do not constitute a breach of the agreement's covenant not to compete.

### Conclusion

For the reasons set forth above, Redline's motion for summary judgment should be denied.

/s/ Anthony Ambrosio
317 Belleville Ave.
Bloomfield, NJ  07003

Attorney for Plaintiff
FPM Financial Services, LLC

Dated: March 18, 2013